GULF & S. I. R. R. Co. *v.* WILLIAMSON *et al.*

(Division B. Feb. 15, 1932. Suggestion of Error Overruled Mar. 28, 1932.)

[139 So. 601. No. 29735.]

Burch, Minor & McKay, of Memphis, Tenn., and T. J. Wills, of Hattiesburg, for appellant.

**Cephus Anderson,** of Hattiesburg, for appellees.

**Griffith, J.,** delivered the opinion of the court.

About ten minutes past six o'clock on the night of January 25, 1931, the brakeman riding in the rear coach of appellant's southbound passenger train heard a noise of the rattling of gravel against the bottom of the coach, which to his experienced ears evidenced something wrong, and he immediately signaled the engineer to stop. The engineer responded at once, and the train was

brought to a stop at a point a little more than one-quarter of a mile below the flag station, called Coats. The train crew made an examination, and found the mangled body of appellees' decedent entangled in the dynamo belt at the rear brake beam of the front trucks of the said rear coach, but in such a way that the head and trunk of the body had been dragging on the gravelled ground between the rails. An investigation along the track in the direction from which the train had come, that is to say, back northward, disclosed signs of blood, and small fragments of the dismembered body, on back to a point fourteen rail lengths from the public crossing of United States highway No. 49, which crosses the railroad at a point about thirty or forty feet south of the pergola of the Coats flag station. The rail length is thirty-nine feet, so that the point where the first signs of blood were found on the track was approximately five hundred forty-six feet south of the crossing. At this point also was found a part of the skull of the body, and also, but lying outside the track, was found the cap that had been worn by the deceased. No sign of the dragging of the body or of any blood or parts of the body could be found north of this point, which, as said, was fourteen rail lengths or five hundred forty-six feet south of the crossing.

It seems to be conceded in the course of the examination of the witnesses that northward from the crossing at Coats the railroad track is straight for a distance of one-quarter of a mile, at which distance northward there is a curve. It is likewise conceded that for a distance of a little more than one-quarter of a mile south of said crossing the track is straight; in other words, that at Coats there is a straight track of one-half mile, the crossing being about at middle of that straight track distance. It is conceded that the railroad track after passing the Coats crossing going southward enters a swampy area without any roads, paths, or adjacent habitations, for a distance of some three miles. There is a difference

among the witnesses in respect to the speed of the train as it passed Coats, but a fair composite of their estimates would place the speed at about forty-five miles per hour. At that season of the year the time would make it after dark, and the witnesses substantially agree on this fact.

The fireman testified that, as the train approached Coats, and until he reached the crossing, he was on the lookout, both for a flag at the Coats flag station and also for the highway crossing; that there was no flag, and he saw nobody either on the crossing or on the track south of the crossing, although he says that the electric headlight of the locomotive was of such power, and its efficiency on this occasion was such, that during his lookout he could see two or three hundred feet beyond the crossing. The engineer was unable to attend the trial because of illness, and his written statement was admitted in evidence in a narrative form, but exactly what he was doing in respect to keeping a lookout as he approached this flag station and crossing is not disclosed except by inference. It was his duty to keep a lookout for the station and crossing, or else see to it that the fireman did so, and, since the fireman so did, as the fireman himself testifies, it is not material to pursue the statement of the engineer further than to say that his testimony is that upon passing the crossing he immediately gave his attention to his machinery, in which connection it is to be noted that the fireman testified at the crossing he left his seat in the cab and proceeded to put coal in the fire box and was no longer on the lookout. Both the engineer and fireman testified that they were unaware that an object had been struck by the train until after the signal to stop.

The deceased was a negro boy about sixteen years of age, and lived with his father in the vicinity of the occurrence in question. There is a small bridge on the said highway 49 about fifty yards east of the railroad crossing at Coats. Two witnesses for appellees testified that

they were traveling on this highway going south, and, when they arrived at this bridge, it became necessary for them to stop and repair a tire; that about the time they had finished the repairs and were replacing the casing the deceased came to them and asked if he could be of assistance, and, being answered in the negative, deceased then walked to the railroad crossing, and that about the time deceased reached the crossing the train came around the curve one-quarter of a mile above the crossing, and that the witnesses could and did then see the deceased, on the track at or near the crossing, in the gleaming light of the electric headlight of the locomotive. One of these witnesses says that he gave no further attention to the boy, his attention having been attracted entirely to the train; but the other of these two witnesses testified that, before the train reached the crossing, he and his companion had finished their tire repairs, and had entered their automobile and had started towards the crossing; that he then noticed that the deceased had started walking down the railroad track southward from the crossing, and was at this time about ten feet south of the crossing. A number of witnesses testified for plaintiff, as usual, that no bell was rung for the crossing and no whistle sounded, while all the train crew testified, as usual, in the affirmative.

A peremptory instruction was refused, and, by the only instruction granted in behalf of the railroad company, the court succinctly placed before the jury the determinative issue in the case. That instruction is in the following words: "The court charges the jury for the defendant that the defendant was under no duty to blow the whistle or ring the bell for the deceased when approaching this crossing and that it owed no duty to keep a lookout for him after he had left the crossing going down the track, and that unless the plaintiff has proved to you by the weight of the evidence that the engineer or fireman in charge of the train saw the de-

ceased in a place of danger and appreciated his peril in time to have stopped the train and prevented the injury, it is your duty under your oaths to find for the defendant.''

The foregoing instruction embodied, in a terse summary, the established principles of law in regard to the duty and the only duty which railroads owe to trespassers on their tracks, especially in a location such as was this track south of this crossing. It will be observed, however, that the instruction was too narrow and its concluding lines, by which the duty of the railroad, after seeing the trespasser in a place of danger and realizing his peril, is limited to that of stopping the train, whereas the duty is, in addition, that immediate warning must be given by sounding the alarm of the locomotive whistle.

But the real issue, squarely placed before the jury, was whether the servant of the railroad company saw the deceased, as he was walking southward on the track with his back to the approaching train. The verdict of the jury was for the plaintiff, from which it follows that the jury believed from all the evidence that the said servant did see the deceased in the situation above mentioned; and the question is whether there is sufficient evidence to support the verdict.

The evidence, in support of the verdict, to briefly summarize it, is that, when the locomotive came into the straight track one-quarter of a mile above the crossing, and thereupon threw the light of the powerful electric headlight down the straight track, a witness saw, in the glare of this light, the deceased walking down the track. The fireman testified that he was maintaining a lookout, and that the headlight was of such power and efficiency that he could see two or three hundred feet beyond the crossing. Deceased was about ten feet south of the crossing when the light of the train clearly feel upon him. The train was running about forty-five miles per

hour, or about ten times the rate at which a person would ordinarily walk. It follows, then, that, while the train was making the one-quarter mile from the curve to the crossing, or one thousand three hundred twenty feet, the deceased had walked not farther than one hundred thirty to one hundred thirty-five feet, which, added to the ten feet he had already traveled below the crossing, would put him about one hundred fifty feet from the crossing when the train reached the crossing. This demonstrates, then, that the deceased was within the effective range of the headlight during the whole time that the fireman says he was keeping a lookout down that track where the deceased was then walking with his back to the train. Thus the evidence, viewed in the light of the summarized physical facts, supports the conclusion that the fireman did see the deceased, that in the nature of things he was obliged to have seen him, and that the statement of the fireman that he did not see the deceased could reasonably be disbelieved; and, as already said, it is evident that the jury came to that conclusion. Under the verdict, in this state of case, and under the authority of New Orleans, M. & C. Railroad v. Harrison, 105 Miss. 18, 61 So. 655, and Kansas City, M. & B. Railroad Co. v. Hawkins, 82 Miss. 209, 34 So. 323, we are required to affirm the judgment.

Affirmed.